IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Action |
| Plaintiff, | No. 3:23-cr-00005 |
| v. | Date: April 8, 2024 |
| DAVID K. SMITH, WESTERN RIVER ASSETS, LLC, and RIVER MARINE ENTERPRISES, LLC, | |
| Defendants. | |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE
UNITED STATES DISTRICT COURT
IN HUNTINGTON, WEST VIRGINIA

APPEARANCES:

For the Government: AUSA Perry D. McDaniel
AUSA Erik S. Goes
U.S. Attorney's Office
Suite 4000
300 Virginia Street East
Charleston, WV 25301

For the Defendant: S. Benjamin Bryant
Carey Douglas Kessler & Ruby
P.O. Box 913
Charleston, WV 25323

Probation Officer: Beth Srednicki

Court Reporter: Carol Curry Adams, CCR RPR

Proceedings recorded by mechanical stenography; transcript produced by computer.

PROCEEDINGS had before The Honorable Robert C. Chambers, Judge, United States District Court, Southern District of West Virginia, in Huntington, West Virginia, on April 8, 2024, at 11:00 a.m., as follows:

THE COURT: Good morning.

MR. GOES: Good morning, Your Honor.

MR. BRYANT: Good morning.

THE COURT: All right. Are we ready to proceed in the case of Mr. Smith and these two companies?

MR. MCDANIEL: The government is ready, Your Honor.

THE COURT: All right.

MR. BRYANT: Yes, Your Honor.

THE COURT: Gentlemen, would you both please stand? Madam clerk, please administer the oath to Mr. Smith.

**DAVID K. SMITH, DEFENDANT, SWORN**

THE COURT: Mr. Smith, do you understand that you are here today for sentencing on behalf of yourself as well as Western River Assets, LLC, and River Marine Enterprises, LLC?

THE DEFENDANT: Yes.

THE COURT: Since the time of the defendant's plea, the probation office has prepared a written Presentence Report as to Mr. Smith and each of the

companies.

Mr. Bryant, you have read those reports?

MR. BRYANT: Yes.

THE COURT: Is there any reason why sentencing should not take place today?

MR. BRYANT: No, sir.

THE COURT: Mr. Smith, have you read the report and discussed it with your attorney?

THE DEFENDANT: Yes.

THE COURT: Do you understand the contents of the reports?

THE DEFENDANT: Yes.

THE COURT: I have reviewed the addendum, and as I understand, the defendant has a few remaining objections as to his individual report. None as to the LLCs. And then the parties have set forth their positions concerning any departures that might be appropriate under the guidelines. So I'll address these objections first, calculate the guideline range, and then counsel can argue concerning any of these departures.

So, Mr. Bryant, as I understand, first, Mr. Smith objects to the factual narrative that's set out in paragraphs 10 through 15 and summarized in paragraph 17.

MR. BRYANT: Your Honor, we had -- we have an objection to the guidelines as calculated by the probation

officer and that's where those points are addressed.

THE COURT: All right. So then with respect to these paragraphs 10 through 15, my recollection is that you objected to some of the characterization of his conduct that suggests that he had been negligent and also the use of the term "seaworthy"; is that correct?

MR. BRYANT: We do object to that.

THE COURT: All right. I deny the objections here. First, I note that -- I don't think there is any claim that anything is inaccurate in those paragraphs, and the probation office attributes those findings to various sources, so that doesn't seem to really be at issue. And to the extent he uses the term "seaworthiness," it doesn't attach any legal significance to that. And obviously, under maritime law, that might be a significant term of art but here, I don't think it's used that way. So I deny that objection.

MR. BRYANT: Your Honor, my understanding is that the term "seaworthy" means it's good and ready to go on the ocean, actually. As applied to this case, it would mean good and operable and meeting standards to operate on the rivers. And this boat was laid up and with the intent that it be, you know, rebuilt or fixed up.

THE COURT: Right.

MR. BRYANT: And because of economics, he could

never do that. The boat was never intended to be operated in the condition in which it was found.

THE COURT: All right. I don't think the report suggests anything to the contrary there so, again, I deny the objection. There is also an objection that you raised to the paragraph that described the civil action that has been maintained against the companies. You note that Mr. Smith was not as an individual a party to those, and no judgment was entered.

MR. BRYANT: Excuse me. There was a miscommunication. We withdraw that objection.

THE COURT: All right.

MR. BRYANT: I thought it was a reference to a different civil matter.

THE COURT: All right. I understand. That's withdrawn. And then I think the remaining objections all relate, as you mentioned, to whether or not the Court ought to exercise its authority to depart under the particular guidelines applicable to the --

MR. BRYANT: Yes, sir.

THE COURT: All right. I'll address that after we get to the question of any departures. Any there any other objections either party wants the Court to address?

MR. MCDANIEL: No, Your Honor.

MR. BRYANT: No, Your Honor.

THE COURT: All right. I find sufficient indicia of reliability to support the probable accuracy of the information in the Presentence Report and the addendum. Accordingly, I adopt the presentence report and the addendum as to each of the defendants.

If an appeal is taken, I order the probation office to submit a copy of the final Presentence Reports to the clerk for filing under seal, and a copy will go to the Court of Appeals and also be provided upon request to appellate counsel except for the recommendation section.

I accept the plea agreements. The defendants' pleas adequately reflect the seriousness of the offense and the agreements will not undermine the statutory purposes of sentencing or the sentencing guidelines. My judgments and sentences will be consistent with the plea agreements.

Mr. Smith, Western River Assets, and River Marine Enterprises stand convicted of discharge of refuse into navigable waters in violation of 33 United States Code, Section 407.

As to Mr. Smith individually, federal law provides for the following maximum punishment: Incarceration of 30 days to a year; supervised release of up to one year; a fine of $25,000 per day of violation or up to $100,000; restitution; and a $25 special assessment.

As to Western River Assets and River Marine

Enterprises, each an LLC, federal law provides for the following maximum punishment: Imprisonment -- or rather probation of 5 years, up to 5 years; a fine of $25,000 per day of violation or a total of $200,000; restitution; and a special assessment of $125.

Turning to the sentencing guidelines, for each defendant, the relevant guideline is in 2Q1.3. We start with a Base Offense Level of 6. There is a four-level increase because the offense involved a discharge, here, oil and other oily mixtures into the Big Sandy River on or about January 10, 2018. That brings the Offense Level up to 10. And then there are several additional enhancements or increases.

There is another four-level increase because of the disruption of a public utility. Here, the City of Kenova had to shut down its municipal drinking water intake for three days. The Coast Guard had to expend over $1.8 million in response to the sinking and the oil spill, so that brings the Offense Level up to 14.

There is another four-level increase if the offense involved a discharge without a permit. Here, there were no permits to discharge into the river, so that brings it up to 18. That then is the actual -- Total Offense Level of 18 with respect to each of the two companies.

However, Mr. Smith gets a two-level decrease for

accepting responsibility since he pled guilty before trial and truthfully admitted his conduct. That brings his Offense Level down to 16. Does the government have a motion with respect to the third point?

MR. MCDANIEL: Your Honor, it's the government's position that the third point of acceptance would be calculated dependent upon the offense after the Court has considered the guided departures and the unguided departures under 2Q1.1. And then once the final calculation of guideline under 2Q1.1 is calculated, then we would consider the third point.

For example, if the Court should depart downward, below 16, then the third point might not be applicable.

THE COURT: I understand.

MR. MCDANIEL: We thought that was the process. But if it's different then --

THE COURT: Well, I don't know that there's different ways of ending up at the same point. And I think we're agreeing about where we end up. I'm going to treat this as a motion based upon the literal application of the guidelines for a one-level decrease, and I will grant the motion. It's consistent with the U.S. Attorney's office and you accepting a plea agreement on behalf of Mr. Smith. So that will bring his Offense Level down --

MR. MCDANIEL: Clearly, if the guideline is above

16, the government would move for the third point of acceptance, yes.

THE COURT: That's the way I am treating it, and I grant that. That would then bring his offense level down to 15. He also gets a two-level decrease under the so-called zero point offender provision in Chapter 4 that are now attached to the sentencing. That would bring it down to 13. Mr. Smith has no criminal history, so he's in Criminal History Category I. As to Mr. Smith individually, with a Total Offense Level of 13 and a Criminal History Category of I, the guideline range would be imprisonment of 12 to 18 months, but there is a statutory maximum of one year in any event. So the guideline range would be up to 12 months; supervised release of a year; a fine of $5,500 up to $55,000; restitution; and a $25 special assessment.

As to Western River and River Marine Enterprises, the guideline is an Offense Level of 18. The punishment then as provided for in the guidelines would be probation of one to five years; a fine, if necessary; and an order of restitution.

So at this point, are there any objections or comments on my calculation of the guideline range?

MR. MCDANIEL: No, Your Honor, not from the government.

MR. BRYANT: No, sir.

THE COURT: All right. I note that each of the parties filed well-written sentencing memoranda arguing -- concerning this rather unusual provision of the applicable guideline that provides in itself the authority of the Court to upward or downward depart based upon each of the enhancements that are applied. So I have read that, and I'll give each of you a chance to summarize your positions about it before I make my final decision. We will start with the defendant.

MR. BRYANT: Your Honor, we have set forth our grounds in the sentencing memo, both the 2Q1.2 for toxic or hazardous substances, as well as 2Q1.3 for other pollutants. This case, both address the issue of negligence. The guidelines, environmental guidelines, were written on the assumption of a knowing violation, that is a felony under the Clean Water Act. So we believe that the departures are appropriate and particularly since the offense of conviction is a strict liability offense under the Refuse Act of 1899. Now, so that's surely, legally speaking, is less serious than even negligence.

One other thing is, Your Honor, just one fact I am remiss in not addressing earlier, and that is when the government sent the order in December of -- the year before, 2017. And there was a period of, I believe, 60 days to get the oil out of the boat, and we failed to advise the

probation office, I believe. Captain Smith did not just sit back and ignore that order, just -- he did not blow off the regulators. He and a man who worked for him tried to get Safety Cleen company to come and remove the oil, and they did not do that promptly because of the conditions on the bank near the boat. And they had set a date of January 18th to come and remove the oil. Unfortunately, the ship sank. He just didn't ignore the government.

THE COURT: I understand that. Thank you. Is there anything else you want to say about your requests for departures on these, at least, three or four provisions where the Court has authority under the guideline to depart?

MR. BRYANT: Well, yes, Your Honor. I think the guidelines are correct because this was not a continuous or repetitive discharge. A hole formed in the bottom of the hull, oil went out. That's one discharge, even though there was oil present for some days after that. But we believe on the basis that this is a strict liability offense, any other specific factors -- I can't stand here and say that oil or oily water is not a -- it's okay. I can't say it's not a harmful substance, and I am not going to. But this wasn't the Exxon Valdez.

I have tried to find similar cases. I haven't found any. Now that doesn't mean they don't exist because I couldn't find them, but I did try to find statistical data

on convictions under the part of the Clean Water Act, that is, the Rivers and Harbors Act. And the commission doesn't break them -- the sentencing commission doesn't break them down that way. And so basically I think we have nearly zero data on other offenders in similar cases, with similar backgrounds, you know, to avoid unwarranted sentencing disparity. We just don't have any comparisons that I'm aware of. I have talked to the government about this. They may have some more knowledge than I do.

THE COURT: All right. All right. Does the government want to offer its position on the defendant's request and the government's own memorandum concerning departures?

MR. MCDANIEL: Yes, Your Honor. With regard to the defendant's request, as we laid out in our memorandum we don't -- we agree that a downward departure may be called for, but solely with regard to the unguided departure that's allowed because this was not knowing conduct.

With regard to the application notes four, six, and seven, those are the guided departures based upon the specific language in those on which the Court can consider going up or down two levels. We clearly do not see the basis for going downward under those departures, mainly because of the significance of the impact here. And those are discussed in the application notes. Even though it was

one day that the boat sank, it was several weeks while they were cleaning it up before they could raise the boat and get it out of the water.  And the Presentence Report makes clear it was the cost that the Coast Guard expended from their fund, it was over $1.8 million, which is very significant for environmental cleanups in West Virginia, obviously exceeded by the Freedom Industry spill, but a very significant impact.  So we would argue no departures on the guided portion, but clearly this is -- we argue even though he pled to a strict liability case that there was some negligence in leaving a vessel that was not seaworthy on the water for so long without having brought it out for a full inspection of it.

And, yes, the Coast Guard did inspect it in November of 2017 and issued an order to remove the risk of oil coming from the ship on to -- it didn't order them to take the boat out; however, that's not the Coast Guard's purview to do a marine engineering analysis of the condition of the ship.

And the government's position at trial, I think as we laid out in our memorandum, would have differed from the defendant's on the cause of the sinking of the boat, and also there would have been a little bit of difference with regard to hiring Safety Cleen.  Our evidence would have been that Safety Cleen was contacted, but there wasn't a definite date that they were actually retained to remove the oil.

But that doesn't really matter because the boat sunk on January 10th. The order said, get somebody on board to take care of the oil by January 30th. So our focus was mainly on the deteriorating condition of the vessel in going in. But we do agree that a downward departure is called for because this was not knowing conduct.

THE COURT: All right. Is there anything else you want to say? I'm going to turn back to the defendant for the final word, then I'll impose sentence. Is there anything else you want me to think -- to consider in this?

MR. MCDANIEL: Only that I do want to introduce -- members of the Coast Guard from the nearby office are here and to the extent -- as we laid out in our memorandum, we're asking for restitution to go to the Coast Guard fund to the extent the defendants are able to pay, understanding that it's not going to happen to reimburse the fund totally, but it was a significant impact and, you know, we clearly applaud the U.S. Coast Guard and very glad that they were nearby and supervised the remediation.

THE COURT: All right. Thank you. All right. Mr. Bryant, you can add anything else you'd like, then I am going to turn to Mr. Smith before I decide.

MR. BRYANT: Yes, sir. I hate to beat a dead horse but seaworthy is a nautical and maritime law principle that does not apply to a disabled boat that is laid up on

the shore. Now, as far as negligence, we believe the Court should not give that any consideration because, one, the boat was tied up, laid up to the shore, did not constitute a violation as far as I know. As far as I'm aware, did not constitute any violation of the regulations.

And I believe the evidence, the most credible evidence is this: The pollution insurer's case, DJ case in New York, went on and on in excruciating detail about how flaws in the boat, et cetera -- reading that report, you could see that many of the flaws assigned to the boat by the pollution insurer's expert had been there, or were likely there, before January 9th.

What was different on January 9th, 10th, big hole in the bottom of the boat, which actually it was the liability carrier that was in litigation with the pollution carrier. But that expert said it's most likely due to river conditions and ice. The ice had been broken up and had some ice get under there and poked a hole in it that night. And it was, you know, a fairly substantial hole. That was the only change as far as any of the reporting or surveys of the boat after the sinking. So we contend that the liability carrier's expert got it right.

I'll point out also that however long the boat was laid up, Captain Smith had an employee go twice each day, morning and evening, to check on it. And the gentleman was there

the evening that the boat sank and back in the morning when the loss was noticed. But had the government not been -- seen its way fit to enter the plea agreement we have, we would unfortunately have gone to trial on the negligence count. That's how strongly my client feels about it and, you know, the boat's got a leak, the oil went out. There is no defense to that under the Rivers and Harbors Act. We are not complaining about that. It's just the difference between the strict liability nature and negligence.

THE COURT: All right. Thank you. Mr. Smith, is there anything you'd like to say before I decide your sentence?

THE DEFENDANT: No, sir.

THE COURT: All right.

MR. BRYANT: Your Honor, he asked that I address a couple comments to the Court on his behalf.

THE COURT: Okay.

MR. BRYANT: He is truly, truly regretful about the whole event. It has caused no end of discord in his life and, you know, he has been a responsible operator on the rivers for many, many years as the letters attached to our motion will show. One of those letters is from a gentleman named Nyhuis, who was the top guy at the Corps of Engineers here for many, many years -- I'm sorry, my apologies, Coast Guard, for a long time. He knows Captain

Smith. And there are other letters. Sonny Smith, a maritime lawyer from Paducah, wrote just I thought a concise and excellent letter. But anyway, neither one of those fellows were aware of a similar case in which the owner or captain was prosecuted. All of this is anecdotal but it's, like, what? And you're what? They did what? The government did what? I am not -- we are not complaining about the regulator's conduct. It's just very unusual when you get to that point of trying to avoid unwarranted sentence disparity.

THE COURT: All right. Anything else?

MR. BRYANT: No, sir.

THE COURT: All right. Well first, the Court will impose sentence on the two LLCs pursuant to the limitations on this Court. All I can do is consider probation and monetary penalties. So with respect to each, I enter punishment as follows: Each company will be on a term of probation for five years. I know that each of these companies has apparently been dissolved and been out of operation for years. But I will make it a special condition of the probation that I am entering here today with respect to each company that they not conduct or operate any business whatsoever during that period of time. They are dissolved, they need to stay dissolved.

Secondly, I order each company to pay a fine in the

amount of $100,000 and then I intend to order each company to be responsible for the restitution amount that I intend to order and make their liability joint and several with that of Mr. Smith. So that takes care of the two companies.

With regard to Mr. Smith, I'll explain my decision here. First, Mr. Smith, it does seem like you had a pretty good record as a river captain and a person well-known to the river community. I note you have been in business for many years. You did and continue to write some column for an industry publication. According to the letters that Mr. Bryant provided to me from those two and other people, it sounds like you had a pretty good reputation, were well respected. I don't doubt that the Gate City ended up being moored because of financial circumstances. It seems entirely likely that you ran into financial difficulties. It was probably expensive to keep it up, probably not generating a lot of business, and that lead to a decision a number of years ago, I think it was -- was it 2010 --

MR. BRYANT: Yes, sir.

THE COURT: -- when the boat was moored?

MR. BRYANT: Yes.

THE COURT: So it sat there. Now I do fault you for what happened after that. And I am not going to try to characterize this as legal negligence. But certainly it was an oversight on your part to literally park the boat there

for that many years. I want to believe, and I think it's probable, that you weren't ready to give up on it, that you had some plan over some time that if things got better you would go in and do the work to get this vessel back up and operating and put it back on the river. And unfortunately, this is what happens sometimes, you know, it sat dormant and time went by and sometimes people don't realize how long something has persisted. And only when something tragic or unfortunate happens, as was the case here, do people tend to look back and think, wow, I can't believe it's been this long and I probably should have done something sooner.

I don't doubt that you had someone monitoring the boat. I am sure you probably were also, at least had it somewhere on your radar that this vessel was still there and sometime you were going to have to do something with it. But nonetheless, time passed, this thing got in worse and worse shape. But not surprisingly, there is -- weather and time play havoc with a vessel like this and when it's not in operation, you're not doing repairs and upkeep and so forth, it falls into bad condition.

And so I do fault you for letting this go on for so many years until finally the Coast Guard said, there is a risk here. This thing could pose a risk to the environment, and so you have got to take steps to get this oil out of there and fix this. So they issued an order in December of

2017.

To your credit, you did start to take steps, I think, reasonably at that point. I am sure you didn't have any real expectation that this boat was going to spring a leak and sink so quickly. It sat there all this time without being a more obvious problem. So it appears you contracted with somebody to come in and, unfortunately, the weather just got the best of all of you.

Not surprisingly, there was high water, there was freezing conditions. The Big Sandy, through this whole area, is very muddy on the banks and apparently the firm that you hired to mitigate this risk found they just couldn't take action at that time. And then the worst happened. The thing sprang a leak and sank and discharged.

So while I do believe that you should have paid more attention to this over time and shouldn't have allowed this thing to get in such bad shape before deciding definitively to do something about it and with it, nonetheless, you weren't in violation at the time. You were taking action based upon the December directive and just, unfortunately, this happened ahead of the schedule for removing the oil and trying do something more long-term to fix this problem. So I do think that those factors have to be balanced in with everything else, and I have considered them here.

So first, with respect to these guidelines, I am sure

your lawyer has explained to you this sort of unusual set of guidelines where literally with each of the four-level increases the Court is also authorized to go up or down two levels. Here, I think the only one that I believe should be reduced is the four-level increase you got for the failure to have a permit. We know you couldn't get a permit for this. It was not possible. So it doesn't make a whole lot of sense to me to apply four levels for that. So I am going to come down two levels on that one.

Then, as I am sure Mr. Bryant's explained to you, the government takes the position that none of those individual departures are warranted, but yet there is an overall sort of bottom end guideline provision here that gives the Court discretion to depart downward where the conduct, the culpability, is not as great as maybe the guideline would otherwise suggest. And here the government, to your benefit, has argued that while I should apply all of those increases as written in the Presentence Report, I should nonetheless depart downward by six levels based upon the fact that this appears to have been negligent conduct and not something more culpable or willful.

So here, I am going to exercise that authority. I am going to come down by four levels, finding that this is a strict liability offense, but your culpability moderates that because, as I have stated, I think you were negligent

over a long period, but not willfully blind or otherwise highly culpable. So I'm going to come down four levels for that.

Then, as both sides argued, once we get through these adjustments, they end up in the same position and that's where I am going to end up as well, that is, to find a final Offense Level of 8 based upon all of this. So with an Offense Level of 8, the guideline range changes from a 12-month imprisonment minimum to zero to 6 months.

So here I have thought a lot about this. Unfortunately, from afar, as I am, thinking about this river, it seems that most people treat this as almost the equivalent as a highway, that its real purpose there is just to handle all of this boat traffic. And unfortunately that results and has resulted in a fair amount of harm to this river and it all goes downstream. So it contributes to problems below it as well.

Here, there was a serious environmental harm because of the boat sinking and leaking this oil. And you're responsible for that. No doubt it was rather shocking for the people of Kenova to find out the water system had been shut down and I think people reasonably were probably quite angry about having their water supply interrupted. I imagine they were fearful about what it meant to have the contamination that their water system would have to then

deal with, and then the huge expense.

It was to great credit that the Coast Guard came in and expended a huge amount of money trying to repair this problem. No one disputes they spent over $1.8 million and they instituted action extremely quickly. So I credit the Coast Guard and its leadership with responding to this public threat and taking definitive action to fix it before it caused more harm. So all of those things are already, I think, figured in the guideline calculation. And so I think it does justify the prosecution that the government brought here and the conviction that it has obtained.

I also find, though, that this is a crime that you're never going to repeat. I don't think -- you've never been in any other trouble. I don't have any reason to believe you're going to be causing any kind of trouble for anybody in the future. You're out of business, you are going to have a huge liability to pay back, the restitution, and no one expects you to do any more than a reasonable effort. But you are going to pay a price for that, and I think it's going to affect your financial status for the rest of your life because of the amount.

But I have considered your age, your health, your past good reputation and performance in this industry and the nature of your culpability and responsibility here. I don't think that a prison sentence is warranted. I don't think

that would serve any purpose.

So, I am going to impose a term of five years of probation with a special condition that you -- or excuse me. I said five years. Not five years, 18 months of probation with a special condition that the first six months be -- you be subject to home confinement, home detention.

With respect to that, you will have to remain at home except for absences approved by the probation office. I am not going to impose electronic monitoring or other sorts of monitoring unless the probation office comes back at some point during the six-month period and tells me they have got concerns about your compliance.

So it will be a six-month term of home confinement where your right to leave your home will be restricted to approved absences for medical care, employment, or some other reason approved by the probation office in advance.

While you are on probation, you must not commit another federal, state, or local crime. You must not possess a firearm or other dangerous device. You must not unlawfully possess a controlled substance.

You will be required to comply with the standard terms and conditions of probation as recommended by the United States Sentencing Commission and as adopted by this Court, except I do not require that you participate in drug and alcohol treatment or testing. I find you pose a low risk of

substance abuse, so I suspend the requirement for drug testing while you are on probation.

I am going to order restitution, and so as to you, I am not going to impose any fine. I've already imposed a fine on the two businesses, although it seems extremely unlikely that either one will ever be in business and generate any income. But with respect to you, I find that you don't have the resources to pay a fine and restitution, so no fine is imposed.

Then with respect to each of the three defendants, I find that there is an identifiable victim, the United States Coast Guard National Pollution Fund Center. The full amount of that loss, my law clerk mentioned that you folks may have had some agreement as to a specific amount or term of restitution? What I have in my notes, based on the Presentence Report, is $1,856,597.92. Is there some agreement?

MR. MCDANIEL: I think that it was 957.92.

THE COURT: 957. I think that's what I said, but maybe I didn't.

MR. MCDANIEL: Okay. Yeah, I believe that we submitted information from the Coast Guard Fund to the probation office that has not been objected to as to the total cost of remediation.

THE COURT: All right. I think that's the right

amount. So I order restitution in that amount. The restitution will be without interest and that's simply because the amount is so great it's unlikely that there would be any substantial payment down. I also order that each of the three defendants be jointly and severally liable for that restitution.

Then with respect to you, Mr. Smith, individually, if you have not paid, the Court is going to order you to pay the restitution that's due immediately. If it's not paid immediately, then I will order that you make payments of $200 per month during your term of probation.

Each of those installments will be payable monthly and they will start within 30 days of today, which is when judgment should be entered in your case. If the probation office determines that a modification of the installment of payments is necessary while Mr. Smith is on probation, the probation office may petition the Court to reevaluate the payments. And payment of restitution will be a special condition of probation.

In connection with that, I'll add these special conditions to the probation terms. First, I require that Mr. Smith provide the probation office access to any requested financial information and authorize the release of that information, including sharing it with the U.S. Attorney's office.

Mr. Smith, you must not incur any new credit or open any additional lines of credit without the probation officer's approval. Any money you receive from income tax refunds, lottery winnings, judgments, or any other anticipated or unanticipated financial gain will be applied to the outstanding obligation here. Also I'll require that you cooperate with the IRS with regard to any civil audit of any personal or business taxes, that you file all returns and any amended returns as required.

Finally, I order that you individually pay a $25 special assessment. It's due immediately. Then with respect to each of the two companies, their special assessments, which are also due immediately, are $125. I believe that's what's set by --

MR. BRYANT: Your Honor, excuse me. Those have been paid.

THE COURT: Already been paid?

MR. BRYANT: A month or so ago, yes.

THE COURT: All right. The Court finds that this sentence is a departure from the guideline range based upon the reasons that I've stated by the Court. I find that this sentence reflects the nature and circumstances of the offense, the history and characteristics of each defendant, and the needs for deterrence. Are there any reasons why these sentences should not be imposed as stated?

MR. MCDANIEL: No, Your Honor.

MR. BRYANT: Your Honor, I'd like to point out one thing I, about a year ago, learned in another case where the gentleman never made more than $40,000 in his entire life and he had a role in an auto warranty fraud scheme involving Toyota. The total losses were over $4 million. This fellow made, I believe it was, $17,000 total out of the whole time. There were a number of other defendants.

Of course, he was subject to the mandatory restitution. He can't pay it. But the government takes 15 percent of his social security payment, and I suppose that will be until the day he dies. But they are taking that 15 percent which would be, I don't know, 400 and some dollars or $500 out of about a $3,000 or little bit more of social security payments. So I just wanted the Court to be aware of that.

THE COURT: All right. Well, here, I will find that I am relying upon the Presentence Report which provides a financial analysis of Mr. Smith. It reports his income, expenditures, and his assets, and a net income of, as I recall, somewhere just above $800.

So I find here that the defendant is able to pay $200 per month. Certainly as I've indicated, the Court can always reevaluate these payments based upon a change in circumstances, whether it's because he has more income or less income. But I base the amount that I'm ordering as a

monthly installment payment on the provisions in the Presentence Report discussing his finances to which there was no objection. And I find that the report sufficiently reveals that the defendant is able to pay, I think, $200 in restitution.

I don't doubt that that's going to be a bit painful, Mr. Smith. That may affect your lifestyle, but to be blunt about it, you could otherwise -- I think you have gone a long time avoiding the financial responsibility that comes with having this vessel and mooring it and hoping that something changes. So you have had the benefit of that for all these years. You took a risk. That risk did not -- was not borne out. Not only has it caused you a loss, it caused a huge loss to the Coast Guard, and an injury to the environment, and to the people of Kenova. So I don't really have any hesitation in concluding that $200 a month is a significant payment for you. I believe you have the financial ability to do it, and I think that that's fair for the Court to consider that. So I order the sentence imposed as stated.

You do have a right to appeal the sentence. If you want to appeal, you have to file a written notice within 14 days or your right to appeal will expire. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you file that notice and the Court finds you don't have the money to hire a lawyer or to get documents for the appeal, those costs will be borne by the United States. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you have a motion with respect to the remaining charge, Count One?

MR. MCDANIEL: Yes, Your Honor. Pursuant to paragraph 2 of the plea agreement, the United States moves to dismiss Count One of the information.

THE COURT: All right. It's consistent with the plea agreement. I grant the government's motion. It's dismissed. The defendant will be interviewed and start probation immediately. Is there anything else we need to address in this case?

MR. MCDANIEL: Not from the United States, Your Honor.

MR. BRYANT: No, sir.

THE COURT: If not, we stand in a brief recess.

I'm sorry, yes, sir.

MR. BRYANT: I'm sorry, Your Honor. There is a point -- we would request the Court remove the travel restriction from the bond. He lives just across the river over in Kentucky.

THE COURT: All right. Well, I think the bond is

terminated by action of this Court today in imposing a probation sentence. So he won't be subject to any of the terms of his bond other than if they happen to also be imposed by the conditions of probation.

MR. BRYANT: I must have misspoke, Your Honor. I meant in the conditions of probation.

THE COURT: What travel conditions are there?

PROBATION OFFICER SREDNICKI: I don't believe there are any, Your Honor.

THE COURT: I'm not aware of any either, but if it makes you more comfortable, certainly we understand that he doesn't reside in West Virginia. He will be supervised by our probation office unless the Eastern District of Kentucky -- is that where he is?

MR. BRYANT: Yes.

THE COURT: If there is some -- if our probation office seeks to transfer supervision to Kentucky, to the Eastern District, to facilitate supervision on probation, he will certainly be made aware of that. Then he will be subject to their supervision.

MR. BRYANT: Yes.

PROBATION OFFICER SREDNICKI: Your Honor, if I may clarify. The defendant needs to check with his supervising officer prior to any travel just in case.

THE COURT: You understand that, Mr. Smith?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. Something else, Mr. Bryant? Anything else?

MR. BRYANT: No, Your Honor.

THE COURT: All right. If not, we stand in recess.

(Proceedings concluded at 11:46 a.m., April 8, 2024.)

CERTIFICATION:

I, Carol Curry Adams, Official Court Reporter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matters as reported on April 8, 2024.

s/Carol Curry Adams, CCR RPR May 24, 2024

Carol Curry Adams, CCR RPR DATE